**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **DAVIS PETROLEUM CORPORATION,** | § | CASE NO. _____ |
| | § | |
| **DAVIS OFFSHORE, L.P. and** | § | CASE NO. _____ |
| | § | |
| **DAVIS PETROLEUM PIPELINE LLC,** | § | CASE NO. _____ |
| | § | |
| | § | |
| **DEBTORS** | § | **JOINTLY ADMINISTERED** |
| | § | **UNDER CASE NO. _____** |

**AFFIDAVIT OF GREGG DAVIS IN SUPPORT OF VOLUNTARY PETITIONS,**
**FIRST DAY PLEADINGS AND DESIGNATION AS COMPLEX BANKRUPTCY CASES**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, personally appeared Gregg Davis, who, upon being duly sworn, deposed and stated as follows:

1.     "My name is Gregg Davis.  I am over twenty one years of age and am fully competent to testify.  I am the President of Davis Petroleum Corporation ("Davis Petroleum"), Debtor and Debtor-in-Possession; Davis Offshore Management LLC, which is the general partner of Davis Offshore, L.P. ("Davis Offshore"), Debtor and Debtor-in-Possession; and Davis Petroleum Pipeline, LLC ("Davis Pipeline"), Debtor and Debtor-in-Possession (collectively referred to herein as either "Davis Companies" or "Debtors").  I have personal knowledge of the facts set forth herein.

1

**Background**

2.      "Filed herewith are voluntary petitions under Chapter 11 of the Bankruptcy Code, for the above-captioned Debtors.  All petitions are filed with the full consent and authority of each entity's board of directors or general partner, as applicable.

3.      "The Debtors continue to operate their businesses and manage their assets as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.      "No trustee, examiner or official committee of unsecured creditors has been appointed or established in these bankruptcy cases.

5.      "Each of the Debtors is directly or indirectly owned and controlled by certain family trusts, to wit: the Marvin and Barbara Davis Revocable Trust under Trust Agreement dated February 3, 2004 (56%); the Gregg Davis Trust under Restated Trust Agreement dated June 4, 1996 (8.8%); the Nancy Sue Davis Trust under Restated Trust Agreement dated October 1, 1990 (8.8%); the John Davis Trust under Trust Agreement dated March 15, 1990, as Amended (8.8%); the Dana Leigh Davis Trust under Restated Trust Agreement dated October 9, 1990 (8.8%); and the Patricia Davis Raynes Trust under Trust Agreement dated March 29, 1990 (8.8%).  Marvin and Barbara Davis were husband and wife; Marvin Davis is deceased.  Nancy Sue Davis, John Davis, Dana Leigh Davis, Patricia Davis Raynes, and Gregg Davis are the children of Marvin and Barbara Davis.

6.      "Davis Petroleum is a Delaware corporation, Davis Pipeline is a Delaware limited liability company, and Davis Offshore is a Texas limited partnership.  The business of Davis Petroleum and Davis Offshore is oil and gas exploration and production.  Davis Petroleum has been engaged for over fifty years in the business of successfully promoting, exploring and developing oil and gas properties successfully. Davis Offshore has been successful in locating,

2

promoting and participating in the development of offshore oil and gas properties in the Gulf of Mexico for over five years. The business of Davis Pipeline is the ownership and operation of an oil and gas gathering pipeline located in Galveston Bay, Texas. The Davis Companies have offices in Houston, Harris County, Texas; Denver, Colorado; and Los Angeles, California. The Davis Companies employ 37 people in Houston; 11 people in Denver, Colorado; one person in Louisiana; one person in California; and one person in Wyoming.

7.     "Davis Petroleum and Davis Offshore own interests in oil and gas properties located in Texas, Louisiana, Oklahoma, Wyoming, and the Gulf of Mexico (on the Outer Continental Shelf, adjacent to the state of Louisiana). Specifically, the principal assets of Davis Petroleum are interests in oil and gas properties that are either located in the Corpus Christi Division or have been previously administered by this Court in the Chapter 11 cases of *In re TransTexas Gas Corporation, et al.*, Case No. 99-21550, United States Bankruptcy Court, Southern District of Texas, Corpus Christi Division; *In re Reliant Exploration, Ltd.*, Case No. 01-24229, United States Bankruptcy Court, Southern District of Texas, Corpus Christi Division; and *In re TransTexas Gas Corporation*, Case No. 02-21926, United States Bankruptcy Court, Southern District of Texas, Corpus Christi Division.

**Secured Creditors**

8.     "Bank of America, N.A. ("BOA") is the administrative agent for the senior secured lender for each of the Davis Companies and is owed approximately $30 million. All of the BOA debt is believed to be collateralized by all of the assets of all Debtors; the Debtors are believed to be jointly and severally liable on the BOA Debt; and the BOA collateral documents contain cross-default clauses. BOA has accelerated its debt and the full amount is due and owing. Sankaty Advisors LLC ("Sankaty") is the collateral agent for the subordinated lender

and is owed approximately $40 million, although its debt and collateral position is expressly subordinate to BOA. The Sankaty debt is also believed to be secured by all assets of all Debtors; all Debtors are believed to be jointly and severally liable on all Sankaty debt; and the Sankaty collateral documents are believed to contain cross-default clauses. Sankaty has accelerated its debt and the full amount is due and owing.

**Necessity of Chapter 11 Protection**

9.      "Exploration, development and production of oil and gas in the Gulf is extremely expensive and, when successful, extremely profitable. As a result of success in the exploration, location and development of its offshore properties, Davis Offshore has experienced an increased need for funding of capital expenditures. Davis Offshore's cash flow was expected to be sufficient to cover the increasing capital expenditure needs, however, the hurricanes (and other adverse weather events) in the Gulf during 2005 hurt the Debtors financially in three ways: (i) a certain well that was producing became shut in as a result of clogs in the pipeline; (ii) delayed development activity drove up costs; and (iii) the spike in natural gas prices resulting from the hurricane season (July – November, 2005) simultaneously with an inability to transact with the Bank due to insufficient credit adversely affected the Debtors' hedge program resulting in an additional $9 million owing to Fleet National Bank, its hedge counterparty. After the adverse weather events in the summer of 2005, the cash flow generated by Davis Offshore's operations in the Gulf was insufficient to fund the increased expenses associated with its operations. As a result of these factors, Debtors' cash needs have escalated and Debtors now face a severe liquidity crisis. In order to pay creditors, correct a negative working capital imbalance, and provide additional capital for development offshore, as well as to provide sufficient capital to

4

continue its onshore development and exploration program, the Debtors require at least an additional $50 million in liquidity between now and August 1, 2006.

10.     "Recognizing the need for additional capital, the Debtors have, for approximately one year up to February 13, 2006, sought a transaction by which a third party would infuse substantial capital into the Debtors and create a liquidity event for current equity owners. After pursuing a number of opportunities, the Debtors elected to do a transaction with Evercore Capital Partners II, LP ("Evercore"), known as the "Original Evercore Deal." In the Original Evercore Deal, all equity interest owners in Debtors were to sell their interests to Davis Petroleum Acquisition Corp. ("Davis Acquisition"), Davis Acquisition was to assume all liabilities of the Debtors with a final amount estimated due to equity holders of approximately $76.8 million, less certain closing adjustments. The Original Evercore Deal was not approved by all equity holders of Debtors which was necessary; the transaction did not close and Evercore terminated negotiations on or about February 13, 2006. After that lengthy, difficult and ultimately unsuccessful experience, Evercore was unwilling to go forward in negotiations with Debtors and their equity owners except upon different terms.

11.     "At the Debtors' request, Evercore spent several days performing supplemental due diligence review of the Debtors' assets and business plan and the result is the current Term Sheet attached to the Debtors' disclosure statement ("Disclosure Statement") as Exhibit "B," Contribution and Sale Agreement dated February 13, 2006 ("CSA") attached to the Disclosure Statement as Exhibit "C," and the current Plan. In the Term Sheet, CSA and Plan, Evercore proposes that Davis Acquisition pay $150 million for 100% of the equity of the Debtors on substantially the same terms as those contained in the CSA, provided, however, that Davis Acquisition takes control of the Reorganized Debtors without any claims of any nature

whatsoever. This change in structure, Evercore's unwillingness to assume liabilities (with certain very limited exceptions), the reduction in value of certain assets, the increase in certain liabilities, including very substantial transaction costs, all result in the net estimated value to equity holders being reduced from $76.8 million to less than $31.7 million. In addition, Evercore has insisted that its current offer must be accepted and a plan confirmed no later than March 15, 2006, and closing occur no later than March 30, 2006, failing which Evercore has the right to decline to close and, in addition, the Debtors will incur substantial additional financial obligations to Evercore (up to 5% of $150 million, or $7.5 million).

12.    "Each Equity Interest Holder is familiar with the current Term Sheet and CSA proposed by Evercore because it is substantially the same as the Original Evercore Deal, with the only change being the price paid and the timing of payment to Equity Interest Holders.

13.    "While waiting to receive Evercore's revised offer in the form of the Term Sheet, Debtors spent substantial effort attempting to find alternatives that would be better for equity owners. The Debtors have prepared a business plan that takes them from the current date through August 1, 2006, a date at which at least two of its offshore properties would be producing. In order to bring creditors current and pay for immediate capital investment obligations, and to keep its offshore interest from going into default for nonpayment, the Debtors require approximately $50 million additional liquidity between now and August 1, 2006. The Debtors' current balance sheet will not support $50 million of additional debt, certainly not outside of bankruptcy. For example, Exhibit 11 to the Disclosure Statement shows that the senior secured indebtedness owing to Bank of America is approximately $29 million, the second (subordinated) secured indebtedness owing to Sankaty is approximately $44 million, for a total of $73 million of secured debt, plus accounts payable and accrued liabilities of approximately

6

$50 million. Exhibit 2A to the Disclosure Statement shows that the present value of Debtors' proved reserves on July 1, 2005, discounted at 10% (PV10) is approximately $113 million. Although Debtors' proved reserves have increased since July 1, 2005, the Debtors believe their current reserves have a liquidation value of $76-86 million, which is shown in Exhibit 4 to the Disclosure Statement. Debtors' reserves certainly have not increased sufficiently to support an additional $50 million of borrowing on top of current indebtedness outside of bankruptcy.

14.     "The Debtors have obtained at least one expression of interest to provide Debtor-in-Possession ("DIP") financing in the range of $40-45 million (subject to very substantial conditions that may not be capable of being satisfied) but only in connection with the DIP lender also being a "stalking horse" for a § 363 auction process. As seen in the liquidation analysis set forth in Exhibit 4 to the Disclosure Statement, the Debtors believe that a § 363 process would not generate sufficient proceeds to pay creditors in full, much less any amounts for Equity Interest Holders. The Debtors' assets in the Gulf of Mexico have certain characteristics that would negatively impact the likelihood of generating a robust interest in an auction, including: (i) the properties are non-operated; (ii) they are non-producing; (iii) the reserves are short-lived; (iv) the properties require very substantial amounts of capital expenditure and, in the case of one, a substantial lead time (estimated at 2-3 years) to bring the production on-line; and (v) they are in the Gulf of Mexico, an area that has significant weather risk from hurricanes and other adverse weather events. Consequently, Debtors have concluded that a DIP loan in the approximate amount of $50 million is not the answer to paying creditors in full and achieving a higher recovery for Equity Interest Holders.

15.     "In summary, Debtors have aggressively sought out sources of capital to remedy this liquidity crisis but have not been successful in finding a solution other than the current

transaction with Evercore. The proposed sale of equity to Davis Acquisition is a solution to the Debtors problem in that it pays creditors in full and generates, on a pro forma basis, approximately $31.7 million for the account of Equity Interest Holders. Debtors have been unable to find any other solution to its balance sheet problem that is as favorable as the current Evercore transaction.

16.    "Debtors are filing this Chapter 11 case in order to preserve the assets of the companies, pay creditors, to recapitalize the companies so that their exploration and production business can continue, to preserve the existing business and employment of 51 employees, and to solve the liquidity crisis.

**Request for Emergency Consideration of "First Day" Motions**

17.    "Contemporaneously herewith, the Debtors have filed the following "first day" motions (the "First Day Motions"):

     i. EMERGENCY MOTION FOR JOINT ADMINISTRATION.

     ii. NOTICE OF DESIGNATION AS COMPLEX CHAPTER 11 BANKRUPTCY CASE.

     iii. EMERGENCY MOTION FOR ORDER LIMITING NOTICE.

     iv. EMERGENCY MOTION FOR ORDER AUTHORIZING CONTINUED (A) USE OF EXISTING BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM, (B) PAYMENT OF DELAY RENTAL PAYMENTS, BONUS PAYMENTS, AND RENEWAL OF CERTAIN CERTIFICATE OF DEPOSIT.

     V. EMERGENCY MOTION TO APPROVE INTERIM AND FINAL AGREED ORDERS AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION TO EXISTING LIENHOLDER.

     vi. EMERGENCY MOTION TO ESTABLISH BAR DATE FOR FILING PROOFS OF CLAIMS AND INTERESTS.

502183 000030 HOUSTON 443378.5

vii.  EX PARTE APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF THOMPSON & KNIGHT LLP AS COUNSEL TO THE DEBTORS AND DEBTORS-IN-POSSESSION.

viii.  EX PARTE APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF JORDAN HYDEN WOMBLE CULBRETH & HOLZER, P.C. AS COUNSEL TO THE DEBTORS AND DEBTORS-IN-POSSESSION.

ix.  EX PARTE APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FTI CONSULTING, INC. AS FINANCIAL ADVISORS TO THE DEBTORS AND DEBTORS-IN-POSSESSION.

x.  EMERGENCY MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 331 ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS.

18.  "The Debtors have filed and intend to confirm a prepackaged plan of reorganization as soon as possible after the Petition Date. As such, an emergency hearing on the First Day Motions is necessary and essential to establish important procedures in these cases and to avoid an immediate shutdown of the Debtors' operations.

**Complex Chapter 11 Bankruptcy Case**

19.  "The Debtors' Chapter 11 cases qualify for complex Chapter 11 treatment because the Debtors have total debt of more than $10 million and there are more than 50 parties in interest.

**Joint Administration**

20.  "The Debtors seek orders directing the joint administration of their Chapter 11 cases for procedural purposes only.

21.  "As the above outline of the ownership of the Debtors through the trusts shows, the Debtors are "affiliates" as that term is defined in Bankruptcy Code § 101(2). The Debtors maintain separate books and records, but, because of common ownership, operate in close

9

concert with each other. The accounting system is centralized for the three entities. Additionally, the assets of the entities are cross-collateralized. The Debtors' intend to file a single plan of reorganization which relates to the assets and liabilities of all three entities.

22.    "In a separate motion, the Debtors request entry of an order waiving any requirement of the Debtors to file any operating reports (monthly or otherwise) required under the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules. If the Debtors are ultimately required to file operating reports, the Debtors seek authority to file a consolidated and single Monthly Operating Report ("MOR") for all three entities. Separate MOR reporting by each Debtor will  create confusion for parties reviewing the MOR's and be burdensome for the Debtors to prepare. The MOR's can be prepared in a single report while still differentiating among the separate Debtor entities.

23.    "The Debtors' need to address cash collateral issues on a joint basis since their assets are cross-collateralized.

24.    "The Debtors do not seek to consolidate their estates at this time. Joint administration alone will not create conflicts between estates. To the extent that the Debtors have intra-debtor credit relationships, they will be disclosed on the Schedules and Statement of Financial Affairs to be filed in each of the cases. In addition, administrative costs will be reduced by approving joint administration of the three Debtor cases as joint administration will obviate the need for duplicative notices, motions, applications, hearings and orders, and will therefore save considerable time and expense for the Debtors and their estates.

25.    "The issues that will be addressed in these bankruptcy cases will be related and overlapping. The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration because the Debtors will continue as separate and distinct

10

legal entities and will continue to maintain separate books and records. Moreover, each creditor may still file its claim against a particular estate. The rights of creditors will actually be enhanced by the reduction in costs resulting from joint administration.

**Limiting Notice**

26.      "The Debtors request an order authorizing the Debtors to limit notice pursuant to the limited service list attached as <u>Exhibit A</u> to the Emergency Motion for Order Limiting Notice ("Limited Service List").

27.      "The parties in interest in the Debtors' chapter 11 cases total in excess of 1,800. They include shareholders, unsecured creditors, royalty owners, overriding royalties owners, and numerous other parties in interest. With such a large number of parties in interest, the cost to mail out every pleading in the case to all creditors and their counsel of record will be significant. Not only will the Debtors' estate suffer, but creditors filing pleadings will likewise be forced to spend significant amounts of money in connection with service of their pleadings, which is grossly unnecessary in light of the Debtors' intention to confirm the Plan within a matter of days following the Petition Date and the fact that all claims of all creditors are unimpaired and should receive 100% of their claims under the Plan. The Debtors therefore seek to limit notice in certain proceedings by establishing a notice procedure.

28.      "Therefore, the Debtors propose to use the Limited Service List, which will include the names and addresses of (i) the Debtors and their counsel; (ii) the United States Trustee; (iii) each member of, and counsel to, any official committees appointed by the Court; (iv) the 20 largest unsecured creditors; (v) the parties in interest who formally request notice by filing a written request for notice with the Clerk of the Court; (vi) all parties who previously filed liens and notified the Debtors; and (vii) other government agencies required to receive notice

502183 000030 HOUSTON 443378.5

under the Bankruptcy Rules and the Local Rules.  The parties in interest required to receive notice of proceedings herein would be limited to those parties included on the Limited Service List.

29.    "The proceedings with respect to which notice would be limited to the Limited Service List would include all matters except the time fixed for filing proofs of claims. Notwithstanding the foregoing, in the event the Local Bankruptcy Rules specifically prescribe that notice of a proceeding shall be given to parties in interest that are in number less than the parties on the Limited Service List, the Debtors would propose to notice only the parties in interest specified in the Local Bankruptcy Rules.

30.    "Additionally, the Debtors request approval to provide notice in the form of electronic mail ("e-mail") to those parties on the Limited Service List providing an e-mail address or who have registered with the Southern District of Texas' electronic noticing program.

31.    "The establishment of noticing requirements pursuant hereto will promote the Debtors' reorganization efforts by preserving assets that otherwise would be consumed by unnecessary copying, postage, and related expenses.  Such relief will benefit the Debtors' estate and their creditors, and will not prejudice the rights of any parties in interest in this case.

**Employment of Professionals for the Debtors and Compensation of Professionals**

32.    "The Debtors request an order authorizing the employment and retention of Thompson & Knight LLP ("T&K") to represent it as counsel for each of the three Debtors.

33.    "The Debtors have chosen T&K because of T&K's extensive experience, knowledge and established reputation in energy reorganizations and debt restructurings under Chapter 11 of the Bankruptcy Code.  The Debtors believe that T&K possesses the requisite resources and is highly qualified and uniquely able to represent the Debtors' interests in this

12

case.  Debtors have designated Rhett G. Campbell ("Campbell"), a partner in T&K, as lead counsel.  Campbell and the other T&K lawyers working on this case are familiar with the Debtors' business and affairs.  T&K has stated its desire and willingness to act in this case and render the necessary professional services as counsel to the Debtors.

34.     "The Debtors are also seeking an order authorizing the retention and employment of Jordan Hyden Womble Culbreth & Holzer, P.C. ("Jordan Hyden") as local counsel for each of the three Debtors.  Debtors have chosen Jordan Hyden because the firm's extensive experience, knowledge and established reputation in energy reorganizations and debt restructurings under Chapter 11 of the Bankruptcy Code.  The Debtors believe that Jordan Hyden possesses the requisite resources and is highly qualified and uniquely able to represent the Debtors' interests in this case.  Debtors have designated Shelby A. Jordan ("Jordan") as lead counsel of Jordan Hyden in these cases.  Jordan and the other firm lawyers working on this case are familiar with the Debtors' business and affairs. The Firm has stated its desire and willingness to act in this case and render the necessary professional services as counsel to the Debtors.

35.     "Additionally, the Debtors seek an order authorizing the retention and employment of FTI Consulting, Inc. ("FTI") as financial advisors for each of the three Debtors.  The Debtors are familiar with the professional standing and reputation of FTI. The Debtors understand that FTI has a wealth of experience in providing financial advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. On February 14, 2006, the Debtors engaged FTI to provide financial advisory services to each of the three Debtors.  Since that time, FTI has developed substantial institutional knowledge regarding the Debtors' operations, finance and systems.  Such experience and knowledge will be

valuable to the Debtors in their efforts to reorganize and maximize the value of their estates. Accordingly, the Debtors wish to retain FTI to provide assistance during these chapter 11 cases.

36.    "The Debtors have also requested that they be authorized to compensate professionals whose employment must be approved by the Bankruptcy Court and who are entitled to be paid by the Debtors (the "Professionals") 80% of their fees and 100% of their expenses on a monthly basis, subject to review and objection by the Debtors, U.S. Trustee and any committee of creditors that may be appointed, and subject to properly filed and allowed fee applications pursuant to applicable U.S. Trustee Guidelines and the requirements of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.

37.    "The Debtors propose that the monthly payment of compensation and reimbursement of expenses of the professionals be structured as follows:

a.    On or before the 25th day of each month following the month for which compensation is sought, each professional will submit a monthly statement (the "Monthly Statement") to the Debtors, the undersigned counsel, the Office of the United States Trustee, and the chairperson of and counsel for any committee appointed. Each such recipient shall have until the tenth day of the next calendar month after the filing of the Monthly Statement to review it. If none of these recipients object, as provided in paragraph (b) below, the Debtors will promptly pay eighty percent (80%) of the fees, with a twenty-percent (20%) holdback, and one-hundred percent (100%) of costs and expenses for the month in that particular Monthly Statement.

b.    In the event the Debtors, the Office of the United States Trustee, or the Committee determines that the compensation or reimbursement sought in a particular Monthly Statement is inappropriate or unreasonable, or that the numbers and calculations are incorrect, such person, as the case may be, shall, on or before the tenth day of the next calendar month after

14

the filing of the Monthly Statement, serve upon the professional whose Monthly Statement is objected to and the other persons designated to receive Monthly Statements, a "Notice of Objection to Fee Statement," with an affidavit setting forth the precise nature of the objection and the amount at issue. Thereafter, the objecting party and the professional whose Monthly Statement is objected to shall meet or confer to attempt to reach an agreement regarding the correct payment to be made. If an agreement cannot be reached or if no meeting or conference takes place, the professional whose Monthly Statement is objected to shall have the option of: (i) filing the Objection together with a request for payment with the Court, or (ii) foregoing the disputed amount until the next interim fee application hearing, at which time the Court will consider and dispose of the Objection if payment of the disputed amount is requested. The Debtors will be required to pay promptly that percentage set forth above of any portion of the fees and expenses and costs requested that are not the subject of an Objection.

      c.     The first Monthly Statement shall be submitted by each of the professionals by the 25th day of April, 2006, and shall cover the period from the Petition date through March 31, 2006.

      d.     Approximately every four (4) months, each of the professionals shall file with the Court and serve on the Office of the United States Trustee and the other parties identified in sub-paragraph (a) above, on or before the 45th day following the last day of the compensation period for which compensation is sought, an application for interim Court approval and allowance, pursuant to Bankruptcy Code § 331, of the compensation and reimbursement of expenses requested for the prior four (4) months. Any professional who fails to file an application when due shall be ineligible to receive further payment of any fees or expenses until such time as the application is submitted.

15

e.      The pendency of an application or a Court order that payment of compensation or reimbursement of expenses was improper as to a particular statement shall not disqualify a professional from the future payment of compensation or reimbursement of expenses as set forth above.

f.      Neither the payment of, nor the failure to pay, in whole or in part, monthly interim compensation and reimbursement as provided herein shall bind any party-in-interest or the Court with respect to the allowance of applications for compensation and reimbursement of professionals.

38.    "The Debtors further request that the Court limit the notice of hearing to consider interim applications to the Limited Service List established in these cases (which includes (i) the Office of the United States Trustee; (ii) counsel to any Committee; and (iii) all parties who have filed a notice of appearance with the Clerk of this Court and requested such notice). Such notice shall apprise the parties most active in this case and will save the expense of undue duplication and mailing.

39.    "The Debtors further request that each member of any Committee appointed be permitted to submit statements of expenses and supporting vouchers to counsel for the Committee, who will collect and submit such requests for reimbursement in accordance with the foregoing procedures for monthly and interim compensation and reimbursement of professionals.

40.    "It is in the best interest of these estates for the Court to establish at an early date a uniform procedure for the consideration of interim applications for compensation of professionals whose employment must be approved by the Bankruptcy Court and who are entitled to be paid by the Debtors. This will enable the Debtors to monitor the fees incurred more effectively and to time their payments of professional fees more regularly, rather than

16

suffer larger depletions to their cash flows on an irregular basis. Additionally, interim guidelines on paying certain fees and expenses will help conserve estate assets and reduce, if not eliminate, the need to file formal objections to interim applications for compensation in the future.

**Establishment of Bar Date for Filing Proofs of Claims and Interests**

41.     "The Debtors request entry of an order pursuant to Federal Rule of Bankruptcy 3003(c)(3) establishing a date by which proofs of claim or interest must be filed or be forever barred (the "Claims Bar Date"). The Debtors request that (i) the Claims Bar Date for all creditors, including governmental agencies, be established as forty-five (45) days after the date actual notice of the bar date is mailed to such parties, without prejudice to such creditors' rights to seek an extension of the bar date for cause on notice and hearing; and (ii) the Claims Bar Date be set forth on the Notice of Commencement of Cases that will be served on all creditors and parties in interest in these cases.

42.     "The Debtors have filed and intend to confirm a prepackaged plan of reorganization as soon as possible after the Petition Date. Therefore, it is necessary for the Debtors and other interested parties to fix the amount of outstanding claims against the Debtors as soon as possible (and prior to confirmation), while still giving creditors a fair opportunity to file their proofs of claims and protect their interests. The relief requested will enable the Debtors to proceed on an expedited basis with their reorganization efforts while allowing creditors and other parties in interest to protect their interests in these cases.

**Bank Accounts, Cash Management System, Delay Rental and Bonus Payments, and Renewal of a Certain Certificate of Deposit**

43.     "The Debtors request entry of an order authorizing their continued use of existing bank accounts and cash management system, and payment of delay rental payments and bonus payments through certain bank accounts, and renewal of a certain certificate of deposit.

17

44.    "Before the Petition Date, the Debtors, in the ordinary course of business, maintained the various bank accounts listed on Exhibit A ("Bank Accounts") attached to the Emergency Motion for Order Authorizing Continued Use of Existing Bank Accounts and Cash Management System ("Bank Account Motion").

45.    "The Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened.  If enforced in this case, this requirement would cause enormous disruption in the Debtors' businesses and impair their efforts to reorganize.  Maintenance of the Bank Accounts would greatly facilitate the Debtors' "seamless transition" to postpetition operations.  To avoid delays in payment of debts incurred postpetition and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted flexibility in deciding to continue to maintain the Bank Accounts and, if necessary, to close some accounts and open new accounts.  Otherwise, the transfer of the Bank Accounts will be tremendously disruptive and time consuming.

46.    "The Debtors will not intentionally pay, and each of the banks where the Bank Accounts ("Banks") are maintained will be directed not to pay, any debts incurred before the Petition Date other than as specifically authorized by this Court.

47.    "The Debtors believe that there may be a number of outstanding checks that were issued prepetition to various parties.  The Debtors have implemented safeguards to prevent prepetition checks from clearing postpetition.  These safeguards include freezing accounts, issuing stop-payment orders, and may require the closing of certain accounts.  Allowing the Debtors flexibility in the maintenance of their existing accounts will help prevent unauthorized postpetition payments on prepetition debts.

48.     "The Debtors also seeks to minimize unnecessary costs and the disruption of their businesses by continuing to use their existing cash management system through the accounts listed on Exhibit A to the Bank Account Motion. Under the Debtors' cash management system, inter-company loans are routinely made and reconciled through these accounts. Generally, inter-company loans are made through the City National Bank accounts, which are the primary accounts for each of the Debtors. The Debtors make inter-company loans to one another on an "as needed" basis. If, for example, Davis Offshore needs cash, and the "Davis Offshore LP" account at City National Bank is low, an inter-company loan may be made to that account from the "Davis Petroleum Pipeline" account at City National Bank. Contemporaneously, "due to" and "due from" entries are made in Davis Pipeline's and Davis Offshore's general ledgers. The "due to" and "due from" entries in each of the Debtors' general ledgers are reconciled at the end of each month in each of the Debtors' financial statements.

49.     "Given the complexity of the Debtors' businesses, as well as the need to preserve and enhance their going-concern values, a successful reorganization of the Debtors' businesses simply cannot be accomplished if there is substantial disruption in their cash management system. The Debtors' businesses will suffer a crippling blow if certain debts are not paid on time, such as delay rental payments under oil and gas leases. It is essential, therefore, that the Debtors be permitted to continue to use their existing cash management system and transfer monies as needed and in the amounts necessary to continue operations. The basic structure of the cash management system described above is part of the Debtors' ordinary, usual, and essential business practices.

50.     "In addition, given the corporate and financial structure of the Debtors, it would be difficult for them to establish an entirely new system of accounts and cash management

19

system.  For example, if the Debtors were required to open separate accounts as debtors-in--possession and rearrange its cash management system, it would necessitate opening numerous bank accounts with attendant delays in the Debtors' ability to operate their businesses while pursuing these arrangements.  Thus, under the circumstances, maintenance of the Debtors' cash management system is not only essential, it is also in the best interests of the Debtors' estates and creditors. The Debtors will continue to maintain strict records with respect to all transfers of cash, so that all transactions can readily be ascertained, traced, and recorded properly on applicable inter-company accounts.

51.     "Preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' cash management system obviously will facilitate their reorganization efforts.  If the Debtors are not permitted to continue utilizing their consolidated cash management system in its current form (modified to the extent necessary by any debtor-in-possession financing arrangements), their operation would be severely, and perhaps irreparably, impaired.

52.     "In the ordinary course of business, the Davis Companies are required, as oil and gas lessees, to make delay rental payments to oil and gas lessors (and/or their successors and assigns) in exchange for the right to not drill during the primary term of the oil and gas lease. The drilling-delay rental clauses that the Davis Companies labor under are structured so that they automatically terminate the lease *unless* delay rental payments are made on time, in the correct amount, to the correct person.

53.     "Additionally, in the ordinary course of business, the Davis Companies make bonus payments to mineral interest owners as an inducement (consideration) to execute an oil

20

and gas lease. These bonus payments must be made in the correct amount to the correct recipient to maintain the lease.

54.     "The Debtors believe that there may be a number of outstanding checks in the form of delay rental or bonus payments that were issued prepetition to various parties. Obviously, it is necessary and critical and in the best interests of the Debtors' estates that delay rental and bonus payments are made on time and in the correct amount.

55.     "Accordingly, the Debtors request that the Court enter an order authorizing the Debtors to pay any outstanding checks or other drafts in the form of delay rental or bonus payments that were issued prepetition but presented for payment postpetition on the Debtors' accounts, including the four accounts enumerated in the Bank Account Motion and the proposed order thereon.

56.     "Furthermore, the Debtors maintain various certificates of deposit ("CD") as cash collateral for certain bonds related to certain projects undertaken in the ordinary course of business and operations of each of the Debtors. CD #XXXXXX582, which is maintained at City National Bank, serves as cash collateral for a bond posted by Davis Offshore to enter into and maintain oil and gas leases offshore in the Gulf of Mexico. This CD is for $300,000.00. The Minerals Management Service ("MMS") of the United States Department of the Interior requires the posting of such a bond to enter into and maintain oil and gas leases offshore in the Gulf of Mexico. This particular CD was purchased and is maintained as an MMS bond for all oil and gas leases entered into and held by Davis Offshore. This CD is scheduled to mature March 12, 2006, and if it is not renewed, Davis Offshore, and therefore the Debtors and their estates, may lose their most valuable assets in the Gulf of Mexico. Additionally, Davis Offshore will likely be unable to enter into any additional leases unless and until the bond is renewed. The Debtors,

21

pursuant to their cash management system, would renew this CD in the ordinary course of business from funds in City National Bank Account Number 019-435814 (which is one of the Bank Accounts listed in Exhibit A to the Bank Account Motion). Therefore, the Debtors request authority to renew this CD through their cash management system from funds in or transferred to its bank accounts, including City National Bank Account Number 019-435814.

57.    "Thus, the Debtors' timely payment of delay rental and bonus payments, and the renewal of the above CD is absolutely vital to the Debtors' reorganization and payment of creditors and interest holders. Absent payment of delay rentals and bonus payments and the renewal of the above CD, its likely that the Debtors' rehabilitative efforts would be immediately aborted.

**Cash Collateral**

58.    "Pursuant to the Emergency Motion to Approve Interim and Final Agreed Orders Authorizing Use of Cash Collateral and Granting Adequate Protection to Existing Lienholder, the Debtors have filed an Interim Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholder ("Cash Collateral Order").

59.    "BOA (the "Prepetition Lender") consents to the Debtors' use of Cash Collateral in strict accordance with the terms and conditions contained in the Cash Collateral Order, which is to be presented to the Court at the hearing on First Day Motions. Without the use of Cash Collateral, the Debtors will not have the funds necessary to maintain their assets, provide financial information, pay employees, payroll taxes, inventory suppliers and other vendors, overhead, lease expenses and other expenses necessary for the reorganization of the Debtors' businesses and to maximize the value of the Debtors' assets. The Debtors' reorganization efforts require the use of Cash Collateral as provided in the Cash Collateral Order and Budget.

22

60.      "The Debtors have requested use of Cash Collateral for such operating purposes set forth in the Budget (as defined in the Cash Collateral Order), and such other purposes as required by the Cash Collateral Order, in order to avoid immediate and irreparable harm to the Debtors' estates that will occur if the Cash Collateral Order is not immediately approved.

61.      "The use of Cash Collateral will benefit the Debtors and these estates.  The ability of the Debtors to attempt to reorganize their businesses depends upon the Debtors' ability to use the Cash Collateral.   Accordingly, the use of Cash Collateral by the Debtors is actual and necessary to preserving the estates, and will avoid immediate and irreparable harm to the Debtors, their estates, and assets.

**Conclusion**

62.      "It is my belief and expectation that the Davis Companies will successfully reorganize through the confirmation of a plan of reorganization by this Court."

*[Remainder of page intentionally left blank.  Signatures to follow.]*

FURTHER AFFIANT SAYETH NAUGHT

Executed this 7th day of March, 2006.

**DAVIS PETROLEUM CORP.**

By: _____
      Gregg Davis, President

**DAVIS OFFSHORE, L.P.**
By: Davis Offshore Management LLC, its general partner

By: _____
      Gregg Davis, President

**DAVIS PETROLEUM PIPELINE, LLC**

By: _____
      Gregg Davis, President

SUBSCRIBED and SWORN to before me, the undersigned authority, on this 7th day of March, 2006.

NANCY MILLER
Notary Public, State of Texas
My Commission Expires
January 09, 2008

_____
Notary Public
My Commission Expires: _1-9-08_

24