-- 'Cramdown'". The Debtors may modify the Plan, to the extent permitted by section 1127(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3019, as necessary to confirm the Plan.

Notice of the anticipated Confirmation Hearing and the time to present objections was provided to holders of Interest Holder Claims on March 2, 2006. **Objections, if any, to confirmation of the Plan must be presented to the Bankruptcy Court at the Confirmation Hearing. Any written objections must also be served so that they are RECEIVED on or before March 8, 2006, at 3:00 p.m. Central Standard Time** by:

> **Counsel to the Debtors:**
>
> Rhett G. Campbell
> Diana Woodman
> Mitchell E. Ayer
> Matthew R. Reed
> Thompson & Knight LLP
> 333 Clay Street, Suite 3300
> Houston, Texas 77002
> Fax: 832.397.8260
> Email: rcampbell@tklaw.com

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.    PLAN SUMMARY

The following table summarizes the classification and treatment under the Plan of the Claims against and Interests in the Debtors. The summary contained therein is qualified in its entirety by reference to the provisions of the Plan, a copy of which is annexed hereto as Exhibit A, and by the balance of this Disclosure Statement. The classification and treatment for all Classes of Claims and Interests are described in more detail elsewhere in this Disclosure Statement. *See* "The Plan - Certain Matters Regarding Classification and Treatment of Claims and Interests".

Class 1.    Administration Claims. These claims are not impaired. Each holder of an Administrative Claim shall be paid in full on the Effective Date, or as such thereafter as a Final Order is entered allowing such claim, and shall not be Impaired by, the Plan. Administrative Claims are estimated to be in the approximate amount of $700,000 as of the Confirmation Date.

Class 2    Bank Claims as to all Debtors. These claims are unimpaired. The Bank Claims are Allowed Claims. On the Effective Date, each holder of an Allowed Bank Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Claim, payment in full of its allowed claims. These claims shall be paid on the Effective Date from the Purchase Price. The Debtors estimate these claims at $20,000,000 and $8,977,477 plus accrued and unpaid interest. These claims are unimpaired and not entitled to vote. Estimated Recovery – 100%.

Class 3    Sankaty Claims as to all Debtors. These claims are unimpaired. The Sankaty Claims are Allowed Claims. On the Effective Date, each holder of a Sankaty Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Sankaty Claim, payment in full of their allowed claims. The Debtors estimate these two claims at $23,904,842 and $20,440,801, plus accrued and unpaid interest and prepayment penalties. These claims are unimpaired and not entitled to vote. Estimated Recovery – 100%.

Class 4    Other Secured Claims as to all Debtors. These claims are unimpaired. Class 4 shall include all secured claims other than Class 2 and Class 3 Claims. The rights of each holder of a Class 4 Claim shall be paid in full on the Effective Date or on the date the claim becomes an Allowed Claim. Class 4 is deemed to have accepted the Plan and therefore is not entitled to vote. Estimated Recovery -- 100%.

Class 5    Priority Tax Claims. These claims are unimpaired. Priority Tax Claims are Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code. The rights of each holder of a Priority Tax Claim shall either be paid in full on the Effective Date or on the date the Claim becomes an Allowed Claim. Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes payable under applicable law or any agreement relating thereto. Estimated recovery is 100%.

Class 6    Priority Claims (other than tax claims) as to all Debtors. These claims are unimpaired. Class 6 shall include all Priority Claims not included in Class 1, 2, 3, 4 or 5. The rights of each holder of a Class 6 Claim shall be paid in full on the Effective Date or on the date the Claim becomes an Allowed Claim. This Class is deemed to have accepted the Plan and therefore is not entitled to vote. Estimated Recovery – 100%.

Class 7    General Unsecured Claims as to all Debtors. These claims are unimpaired. Class 7 shall include all General Unsecured Claims against the Debtors. Each holder of a Class 7 Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Class 7 Claim, payment in full of its allowed claim on the Effective Date or on the date the Claim becomes an Allowed Claim. Payment shall be from the Purchase Price on the Effective Date or from the Liquidating Trust. The Liquidating Trust shall include available insurance proceeds from applicable policies. This Class is deemed to have accepted the Plan and therefore is not entitled to vote. Estimated Recovery -- 100%.

Class 8    Intercompany Claims as to all Debtors are unimpaired. On the effective Date, all Intercompany Claims shall be assumed by and become the obligations of the respective Reorganized Debtors. This Class is deemed to have accepted the Plan and therefore is not entitled to vote. Estimated Recovery -- 100%.

Class 9    Interests in Davis Petroleum. These stock Interests are impaired. Holders of Davis Petroleum Interests shall receive their pro rata distribution of the Purchase Price in accordance with the Plan. Estimated Recovery – more than in a Chapter 7 case.

Class 10   Interests in Davis Offshore.  These partnership Interests are impaired.  Holders of  Davis Offshore Interests shall receive their pro rata distribution of the Purchase Price in accordance with the Plan.  Estimated Recovery – more than in a Chapter 7 case.

Class 11   Interests in Davis Pipeline.  These member Interests are impaired.  Holders of Davis Pipeline Interests shall receive their pro rata distribution of the Purchase Price in accordance with the Plan.  Estimated Recovery – more than in a Chapter 7 case.

## III.   HISTORY OF THE DEBTORS

### A.      Overview of Business Operations

The business of Davis Petroleum and Davis Offshore is oil and gas exploration and production.  Davis Petroleum and Davis Offshore own interests in oil and gas properties located in Texas, Louisiana, Oklahoma, Wyoming, and the Gulf of Mexico (on the Outer Continental Shelf, adjacent to the state of Louisiana).   Davis Petroleum has been engaged for over sixty years in the business of successfully promoting, exploring and developing oil and gas properties onshore.  Davis Offshore has been successful in locating, promoting and participating in the development of offshore oil and gas properties in the Gulf of Mexico for over five years.  The business of Davis Pipeline is the ownership and operation of an oil and gas gathering pipeline located in Galveston Bay, Texas.

Exploration, development and production of oil and gas in the offshore Gulf is extremely expensive and, when successful, extremely profitable.  As a result of success in the exploration, location and development of its offshore properties, Davis Offshore has experienced an increased need for funding of capital expenditures.  Davis Offshore's cash flow was expected to be sufficient to cover the increasing capital expenditure needs, however, the hurricanes (and other adverse weather events) in the Gulf during 2005 hurt Davis Offshore financially in three ways: (i) a key well that was producing became shut-in as a result of clogs in the pipeline and remains shut-in; (ii) development operations with three deepwater rigs were severely delayed increasing costs; and (iii) the spike in natural gas prices resulting from the hurricane season (July – November, 2005) simultaneously with an inability to produce hydrocarbons adversely affected the Davis Companies' hedge program resulting in an additional $9 million owing to Fleet National Bank, its hedge counterparty.  After the adverse weather events in the summer of 2005, the cash flow generated by Davis Offshore's operations in the Gulf was insufficient to fund the increased expenses associated with its operations.  There was no cash flow, only development costs.

The Debtors have ownership rights in three offshore Gulf of Mexico projects, two of which are almost producing hydrocarbons (within sixty (60) days).  As a result of these factors, Debtors' cash needs have escalated and Debtors now face a severe liquidity crisis.

### B.      Corporate and Capital Structure

The Chart below is a diagram of the corporate and capital structure of the Debtors. Attached hereto as Exhibit 1 is a chart detailing the percentage ownership interests of each of the interest owners of the Debtors.

9

## Davis Offshore Ownership



## Davis Petroleum Corp. Ownership



## Davis Pipeline Ownership



LA1:1100523.1

10

## C.   Events Leading to the Chapter 11 Filings and the Current Plan

Davis Offshore is engaged in offshore oil and gas development projects in the Gulf of Mexico that require substantial capital investment.  In order to pay creditors, correct a negative working capital imbalance, and provide additional capital for development offshore, as well as to provide sufficient capital to continue its onshore development and exploration program, the Debtors require at least an additional $50 million in liquidity between now and August 1, 2006.

Recognizing the need for additional capital, the Debtors have, for approximately one year up to February 13, 2006, sought a transaction by which a third party would infuse substantial capital into the Debtors and create a liquidity event for current equity owners.  After soliciting proposals from various equity capital providers, the Debtors elected to pursue a transaction with Evercore, which became known as the "Original Evercore Deal."  In the Original Evercore Deal, all equity interest owners in Debtors were to sell or contribute their equity interests in the Debtors to acquisition vehicles organized and owned by Evercore and its co-investors.  The Gregg Davis Trust accepted an opportunity to accept its distribution in the form of a capital contribution to the acquisition vehicles on the same basis as Evercore.  Debtors are advised that Evercore originally made the same offer to all (subject to Evercore getting at least 80% of the equity) Interest Holders but only the Gregg Davis Trust accepted.

The principal terms of the Original Evercore Deal are dramatically different from the current transaction.  In the Original Evercore Deal, Davis Acquisition was to pay a purchase price for equity and assume all liabilities of the Debtors, with a final amount estimated due to equity holders of approximately $76.8 million, less certain closing adjustments.  The Original Evercore Deal was approved by all equity holders of Debtors as to certain of the terms of the acquisition such as price, payment terms, holdbacks, reps, and warranties.  However, after lengthy and exhaustive negotiations, Evercore was unable to reach agreement with all of the equity holders on all terms and therefore terminated negotiations on or about February 5, 2006.  Exhibit 12 is Schedule 2-2(c) to the February 13, 2006, CSA and is the best estimate of amounts that would have been due to equity holders under the Original Evercore Deal.  After that lengthy, difficult and ultimately unsuccessful experience, Evercore was unwilling to go forward in negotiations with Debtors and their equity owners except upon different terms.

At the Debtors' request, Evercore spent several days performing supplemental due diligence review of the Debtors' assets and business plan and the result is the current Term Sheet, CSA, and the current Plan.  In the Term Sheet, CSA and Plan, Evercore proposes that Davis Acquisition pay $150 million for 100% of the equity of the Debtors on substantially the same terms as those contained in the CSA dated February 13, 2006, provided however, that the Debtors must pay all claims so that Davis Acquisition takes control of the Reorganized Debtors without any claims of any nature whatsoever.  This change in structure, Evercore's unwillingness to assume the Debtors' significant negative working capital position and certain other liabilities, the reduction in value of certain assets, the increase in certain liabilities, including very substantial transaction costs, all result in the net estimated payment to equity all holders being reduced from $76.8 million to $31.5 million.  In addition, Evercore has insisted that its current offer must be accepted and a plan confirmed no later than March 15, 2006, and closing occur no

11

later than March 30, 2006, failing which Evercore has the right to decline to close and, in addition, the Debtors will incur substantial additional financial obligations to Evercore.

From the point of view of the Interest Holders of Debtors, the Debtors believe that each Interest Holder is quite familiar with the current Term Sheet and CSA proposed by Evercore because it is substantially the same as the Original Evercore Deal, with the most significant change being the substantial reduction in the price to be paid to Interest Holders.

Since receiving Evercore's revised offer in the form of the Term Sheet, Debtors have spent substantial effort attempting to find alternatives that would satisfy its obligations and be better for equity owners. The Debtors have prepared a business plan that takes them from the current date through August 1, 2006, a date at which at least two of its offshore properties would be producing. In order to bring creditors current and pay for immediate capital investment obligations, and to keep its offshore interests from going into default for nonpayment, the Debtors require approximately $50 million additional liquidity between now and August 1, 2006. The Debtors' current balance sheet will not support $50 million of additional debt, certainly not outside of bankruptcy. For example, Exhibit 11 shows that the senior secured indebtedness owing to Bank of America is approximately $29 million, the second (subordinated) secured indebtedness owing to Sankaty is approximately $44 million, for a total of $73 million of secured debt, plus accounts payable and accrued liabilities of approximately $50 million. Exhibit 2A shows that the present value of Debtors' proved reserves on July 1, 2005, discounted at 10% (PV10) is approximately $113 million. Although Debtors' proved reserves have increased since July 1, 2005, the Debtor believes its current reserves have a liquidation value of $76-86 million (Exhibit 4). Debtors' reserves certainly have not increased sufficiently to support an additional $50 million of borrowing on top of current indebtedness.

The Debtors have obtained at least one expression of interest to provide a Debtor-in-Possession ("DIP") financing in the range of $40-45 million (subject to very substantial conditions that may not be capable of being satisfied) but only in connection with the DIP lender also being a "stalking horse" for a § 363 auction process. As seen in the liquidation analysis, Exhibit 4, the Debtors believe that a § 363 process would not generate sufficient proceeds to pay creditors in full, much less any amounts for equity owners. Among other reasons for this, the Debtors' assets in the Gulf of Mexico have certain characteristics that would negatively impact the likelihood of generating a robust interest in an auction, including: (i) the properties are non-operated; (ii) they are non-producing; (iii) the reserves are short-lived; (iv) the properties require very substantial amounts of capital expenditure and, in the case of one, a substantial lead time (estimated at 2 years) to bring the production on-line; and (v) they are in the Gulf of Mexico, an area that has significant weather risk from hurricanes and other adverse weather events. Consequently, Debtors have concluded that a DIP loan in the approximate amount of $50 million is not the answer to paying creditors in full and achieving a higher recovery for Interest Holders.

In summary, Debtors have aggressively sought out sources of capital to remedy this liquidity crisis but have not been successful in finding a solution to its liquidity problem other than the current transaction with Davis Acquisition. The proposed sale of equity to Davis Acquisition is a solution to the Debtors' problem in that it pays creditors in full and generates, on a pro forma basis, approximately $31.5 million for the account of Interest Holders. Debtors have

been unable to find any other solution to its balance sheet problem that is as favorable as the Davis Acquisition transaction.

As of the date of the filing of the petitions, Debtors are facing a severe liquidity crisis that puts at risk the assets of all of the Davis Companies. See Exhibit 13 to this Disclosure Statement which is a current operating budget. Debtors are filing this Chapter 11 case in order to preserve the assets of the companies, pay creditors, to recapitalize the companies so that their exploration and production business can continue, to preserve the existing business and employment of 51 employees, and to solve the liquidity crisis.

### D.    Description of Assets and their Value

Attached hereto as Exhibit 2 is a summary of the assets of the Debtors and their estimated values. Attached as Exhibit 2A is a summary of the most recent Netherland Sewell & Associates reserve report for the Debtors' proved oil and gas reserves.

### E.    Anticipated Future of the Debtors

The Debtors' assets will continue to be operated after the confirmation of the plan with new ownership. After confirmation and closing, the purchasing entity, Davis Acquisition, will own the outstanding interests of the Debtors. The Debtors are advised that Davis Acquisition intends to contribute substantial capital into the Reorganized Debtors on a go-forward basis and to continue in business as an active exploration and production company.

### F.    Source of Information

The Debtors' books and records provided the information contained in this disclosure statement. The Liquidation Analysis that is Exhibit 4 was prepared by FTI Consulting, financial advisors to the Debtors, along with the assistance of the Debtors. The summary of assets that is Exhibit 2 was also prepared by FTI Consulting. Netherland & Sewell provided a reserve report.

### G.    Pending Litigation

A list of pending litigation in which any of the Debtors is involved is attached as Exhibit 3.

### H.    Liquidation Analysis

A Liquidation Analysis, accompanied by assumptions is attached hereto as Exhibit 4.

### I.    Future Management of the Debtors

The Gregg Davis Trust (of which Gregg Davis is the beneficiary) is a direct or indirect equity owner of the Debtors and is therefore an Interest Holder. During his employment term, Gregg Davis will serve as the President and Chief Executive Officer of Davis Petroleum. In return, Mr. Davis will receive an annual base salary of $600,000 and be eligible to receive an annual bonus based on a target bonus amount of $200,000 upon achievement during the fiscal year of various

company and individual goals established by the Board.  The employment term is one year, and will be renewed on a year-to-year basis unless either party notifies the other in writing within 90 days before the end of the then-current term that the term shall not be extended for an additional year.  If Davis Petroleum terminates Mr. Davis's employment without Cause (as defined in the Employment Agreement) or if he resigns for Good Reason (as defined in the Employment Agreement), Davis Petroleum must pay to Mr. Davis as severance a single lump sum payment equal to 200% of the sum of his base salary plus the average of the annual bonus amounts paid for the two most recently completed fiscal years preceding the employment termination date.  As part of his compensation, Mr. Davis will continue to receive a 1.0% of 8/8ths overriding royalty interest in Davis Petroleum's onshore drilling prospects, and a 0.75% of 8/8ths of Davis Offshore's offshore drilling prospects.

Davis Acquisition is allowing Davis Petroleum key employees the opportunity to make equity contributions of up to $5 million of the total investment being made by Evercore in Davis Acquisition.  The timing of those equity contributions has not been decided by Evercore, and thus it is possible that key employees could be permitted to make such contributions at closing, some undetermined period of time after closing or both.  Davis Petroleum key employees will also be eligible to receive restricted common stock and stock options to acquire common stock of Davis Acquisition totaling up to 13.5% of Davis Acquisition's fully-diluted equity after the transaction, with up to 3.5% allocated to restricted stock and up to 10.0% allocated to stock options.  The stock options shall be comprised equally of two classes having different exercise prices, and shall vest ratably over a five-year period.  One-half of the stock options shall be exercisable at a per-share price equal to the "post-money valuation" of Davis Acquisition (the "1 times options") divided by the then-fully-diluted number of shares of Davis Acquisition common stock.  The remaining ½ of the stock options shall be exercisable at a per-share price equal to two and one-half times the "post-money valuation" of Davis Acquisition (the "2.5 times options") divided by the then-fully-diluted number of shares of Davis Acquisition common stock.  Thus, the value of the options will not exceed the exercise price unless and until the "post-money" valuation of Davis Acquisition exceeds the valuation established at closing (and in the case of the 2.5 times options, until the "post-money valuation" exceeds the valuation established at closing by more than 2.5 times).

As part of his compensation, Mr. Davis shall receive at closing an award of restricted stock of Davis Acquisition equaling 50% of the approximately 3.5% (or approximately 1.75%) of the fully diluted shares of reserved restricted stock.  The restricted stock becomes nonforfeitable upon: (i) the termination of Mr. Davis's employment without Cause; (ii) Mr. Davis's resignation from his employment for Good Reason; (iii) Mr. Davis's death or disability during his employment; (iv) the occurrence of a change of control of Davis Acquisition. The restricted stock will be forfeited if Mr. Davis's employment is terminated for Cause or if he resigns for other than Good Reason. Upon the termination of Mr. Davis's employment, as to any shares of restricted that are not forfeited pursuant to the foregoing sentence, Davis Acquisition has the right to repurchase the restricted stock at any time thereafter by notifying Mr. Davis of the exercise of that right, and by paying to him the fair market value of such shares as shall be determined by the board of Davis Acquisition.  The remaining key employees shall receive at closing restricted stock totaling 33% of the reserved restricted stock, such that approximately 83% of the reserved restricted stock shall be awarded at closing. All shareholders of Debtors, including Mr. Davis, will enter into a stockholders' agreement among Davis Acquisition and its stockholders under which Mr. Davis will serve as one of seven board members of Davis

14

Acquisition. The Purchaser has the right to appoint the remaining six directors to the board.   Mr. Davis shall also be granted at closing options to purchase a number of shares of Davis Acquisition common stock equaling 20% of the total reserved 1 times options and 10% of the total 2.5 times options. The remaining key employees shall receive at closing stock options to purchase a number of shares of Davis Acquisition common stock equaling approximately 58% of the total 1 times options and approximately 30% of the total 2.5 times options, such that approximately 78% of the reserved 1x options and 40% of the reserved 2.5 times options shall be awarded at closing.

During the employment term, George Canjar will serve as the Executive Vice-President and Chief Operating Officer of Davis Petroleum Corporation.  In return, George Canjar will receive a base salary at the annual rate of $375,000.  The employment term is one year.

Davis Petroleum key employees Mark Gillespie, John Bellis, Michael Clark, Ed Stengel and John Sansbury will also enter into employment agreements with Davis Petroleum having one-year initial terms.

Grace Drulias will be employed by the Reorganized Debtors under the terms of a consulting agreement to provide transition services.

A copy of the proposed employment agreement between Gregg Davis and the reorganized Davis Petroleum is attached here to as Exhibit 5.]

### J.    Other Financial Information

The most recent consolidated unaudited financial statements for the Debtors dated November 30, 2005 are attached hereto as Exhibit 6.

### K.    Insurance Policies

A schedule of Debtors' insurance policies with limits is attached hereto as Exhibit 7.  The listed  policies will be transferred to the Liquidating Trust for the benefit of the indemnified or otherwise covered unsecured creditors.  Unsecured creditors covered by such policies shall recover first against the policies and then from assets of the Liquidating Trust.  To the extent the Liquidating Trust pays Allowed Claims to creditors who would otherwise be covered by such policies, the Liquidating Trust shall be subrogated to the rights of such creditors to such insurance.

### L.    Preference Analysis

Debtors do not have a preference analysis at this time.  All creditors are being paid in full.  Debtors believe there are no preferential or avoidable transfers.

## IV.    TIMING OF THE CHAPTER 11 CASES

Subject to receiving the requisite acceptances on the Plan, the Debtors intend to commence their Chapter 11 Cases on **March 7, 2006**.  The Debtors do not have  debtor-in-possession financing and very limited sources of cash.  The Debtors therefore do not expect the Chapter 11 Cases to be protracted. **In fact, the Debtors will request confirmation of the plan**

15

**at the earliest possible opportunity.** Specifically, the Debtors will request that the hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan occur as early as **March 9, 2006.** Assuming that the Plan is confirmed at that hearing, the Plan provides that the Effective Date will be the Business Day on which all conditions to the consummation of the Plan have been satisfied or waived (as provided in Article VIII of the Plan). *See* "The Plan -- Conditions Precedent to the Plan's Confirmation and the Effective Date" below. The Effective Date could be the same day as the Confirmation Hearing. In fact, the Debtors will endeavor to cause the Plan to become effective immediately upon or after confirmation of the Plan. **Under this timetable, if approved, the Debtors would emerge from Chapter 11 the day after they commence the Chapter 11 cases.** Note that there is a possibility that this projected timetable cannot be achieved due to factors beyond the control of the Debtors.

The Purchaser of the Equity Interests in the Debtors, Davis Acquisition, has made a condition of the closing of the Purchase that the Plan be confirmed no later than **March 15, 2006,** and that the closing occur no later than **March 30, 2006.** The Debtors believe it is in the best interests of the Debtors, their Creditors, and their Interest Holders that the Plan be confirmed and the Purchase be closed on this timetable. The Debtors also believe it is important that the length of their stay in Chapter 11 be as short as possible. Debtors want to preserve the value of their assets which requires immediate additional capital.

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.

THE SUMMARIES OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS, AND REFERENCE IS MADE TO THE PLAN AND THE OTHER DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN OR THE OTHER OPERATIVE DOCUMENT WILL CONTROL.

### A.    Overall Structure of the Plan

Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria. If the Plan is confirmed by the Bankruptcy Court and consummated, every Class of Claims will receive distributions on the Effective Date or on the date the Claim becomes an Allowed Claim equal to the full amount of the Claims, with

the exception of the Interests in the Debtors. The Debtors have prepared <u>Exhibit 11</u>, which demonstrates that all Claims will be paid in full from the Purchase Price and that approximately $21.5 million should be left for distribution to Equity Interests, after deduction of the $10 million holdback. There is no assurance that these estimates are accurate but they are based on the best information available to Debtors at this time. Davis Acquisition requires that up to $10 million of the Purchase Price be reserved for the payment of Indemnity Claims that may be due by Debtors to Purchaser pursuant to the Term Sheet and the CSA. Such amount will be retained in the Liquidating Trust until thirty days after the expiration of the Indemnity Period, as defined in the Plan, at which time any amounts not paid to Purchaser or reserved for such payments shall be free to be distributed in accordance with the Plan.

### B.    Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims of a debtor's creditors and the claims of its interest holders. In accordance with section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, and Priority Tax Claims. The Debtors are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes which contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122; however, it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this Solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of a Claim or Interest after approval of the Plan could necessitate a re-solicitation of acceptances of the Plan.

<u>Class 1.</u>    Administration Claims. These claims are not impaired. Administration Claims are Claims for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtors' Estates and operating their businesses, including wages, salaries, or commissions for services rendered, and (b) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code. Each holder of an Administration Claim shall be paid in full on the Effective Date to the extent such claim is an Allowed Claim, or as such thereafter as a Final Order is entered allowing such claim, and shall not be Impaired by, the Plan. Each holder of an Administration Claim shall receive Cash equal to the unpaid portion of its Administration Claim on the date on which its Administration Claim becomes payable under applicable law or any

502183 000030 HOUSTON 442070.2

agreement relating thereto. Administration Claims are a function of the time the Davis Companies are in bankruptcy and are estimated to be approximately $700,000.

    <u>Class 2</u>    Bank Claims as to all Debtors. These claims are unimpaired. The Bank Claims are Allowed Claims. On the Effective Date, each holder of an Allowed Bank Group Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Claim, payment in full of their Allowed Claims. These claims shall be paid from the Purchase Price at closing. These claims are unimpaired and not entitled to vote. Estimated Recovery – 100%.

    <u>Class 3</u>    Sankaty Claims as to all Debtors. These claims are unimpaired. The Sankaty Claims are Allowed Claims. On the Effective Date, each holder of a Sankaty Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Sankaty Claim, payment in full of their Allowed Claims from the Purchase Price at closing. These claims are unimpaired and not entitled to vote. Estimated Recovery – 100%

    <u>Class 4</u>    Other Secured Claims as to all Debtors. These claims are unimpaired. Class 4 shall include all secured claims other than Class 2 and Class 3 Claims. Each claim in Class 4 shall be paid in full in cash on the Effective Date to the extent such Claim is an Allowed Claim, or on the date such Claim becomes an Allowed Claim. Class 4 is deemed to have accepted the Plan and therefore is not entitled to vote. Estimated Recovery -- 100%

    <u>Class 5</u>    Priority Tax Claims. These claims are unimpaired. Priority Tax Claims are Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code. Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes an Allowed Claim or becomes payable under applicable law or any agreement relating thereto. Estimated recovery is 100%.

    <u>Class 6</u>    Other Priority Claims as to all Debtors. These claims are unimpaired. Class 6 shall include all Priority Claims not included in Class 1, 2, 3, 4 or 5. Each holder of a Class 6 Claim shall be paid in full in cash on the Effective Date to the extent it is an Allowed Claim or on the date such claim becomes an Allowed Claim. These claims shall be paid from the Liquidating Trust. This Class is deemed to have accepted the Plan and therefore is not entitled to vote. Estimated Recovery – 100%.

    <u>Class 7</u>    General Unsecured Claims as to all Debtors. These claims are unimpaired. Class 7 shall include all General Unsecured Claims against the Debtors. Each holder of a Class 7 Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Class 7 Claim, payment in full on the Effective Date to the extent it is an Allowed Claim or on the date such claim becomes an Allowed Claim. Class 7 Claims shall be paid from the Purchase Price at closing or from the Liquidating Trust. Insurance policies covering Class 7 Claims will be transferred to the Liquidating Trust for the benefit of the indemnified or otherwise covered unsecured creditors. Unsecured creditors covered by such policies shall recover first against the policies and then from assets of the Liquidating Trust. To the extent the Liquidating Trust pays Allowed Claims to creditors who would otherwise be covered by such policies, the Liquidating Trust shall be subrogated to the rights of such creditors to such insurance. This

Class is deemed to have accepted the Plan and therefore is not entitled to vote. Estimated Recovery -- 100%.

Class 8    Intercompany Claims as to all Debtors. These claims are unimpaired. On the Effective Date, all Intercompany Claims shall be assumed by and become the obligations of the respective Reorganized Debtors. This Class is deemed to have accepted the Plan and therefore is not entitled to vote. Estimated Recovery -- 100%.

Class 9    Interests in Davis Petroleum. These stock Interests are impaired. Holders of Davis Petroleum Interests shall receive their pro rata distribution of the Purchase Price in accordance with the Plan. Estimated Recovery – more than in a Chapter 7 case.

Class 10    Interests in Davis Offshore. These partnership Interests are impaired. Holders of Davis Offshore Interests shall receive their pro rata distribution of the Purchase Price in accordance with the Plan. Estimated Recovery – more than in a Chapter 7 case.

Class 11    Interests in Davis Pipeline. These member Interests are impaired. Holders of Davis Pipeline Interests shall receive their pro rata distribution of the Purchase Price in accordance with the Plan. Estimated Recovery – more than in a Chapter 7 case.

### C.    Means for Implementation of the Plan

#### 1.    Continued Corporate Existence

The Reorganized Debtors shall continue to exist as separate corporate entities, in accordance with the applicable law in the respective jurisdictions in which they are incorporated, under their respective certificates of incorporation and by-laws in effect before the Effective Date, except as their certificates of incorporation and by-laws are amended by the Plan or the Term Sheet.

#### 2.    Certificates of Incorporation and By-laws

The certificate of incorporation and by-laws of each Reorganized Debtor shall be amended as necessary to satisfy the provisions of the Plan, the Term Sheet, or the Contribution and Sale Agreement and the Bankruptcy Code and shall include, among other things, under section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities.

#### 3.    Restructuring Transactions

On the Effective Date, Equity Interests in the old Debtors will be cancelled and new Equity Interests will be issued for each of the Reorganized Debtor companies. On the Effective Date, Davis Acquisition will provide additional capital to the Reorganized Debtors in an amount sufficient for the Reorganized Debtors to continue business operations going forward. The Reorganized Debtors shall own their assets free of any debts, claims or liabilities after the Effective Date so that their continued viability is not in doubt.

The newly issued equity in the Reorganized Debtors shall be acquired by Davis Acquisition on the terms set forth in the Term Sheet, attached hereto as <u>Exhibit B</u>, and the Contribution and Sale Agreement dated February 13, 2006, attached hereto as <u>Exhibit C</u> with such changes as are set forth in the Term Sheet or required by the Plan. The Term Sheet provides that the interests in the Reorganized Debtors shall be purchased for the amount of $150 million, less adjustments. Allowed Claims may be paid from the Purchase Price at Closing. That portion of the Purchase Price not used to pay Allowed Claims at Closing will be paid into the Liquidating Trust for the benefit of the creditors of the Debtors and, after all Allowed Claims are paid in full or adequately reserved, for the benefit of Equity Interests. All prepetition claims, including administrative claims (both of the Debtors and the Liquidating Trust), tax and priority claims, and unsecured claims shall be paid pursuant to the terms of the Plan from the Purchase Price. After payment in full of all Allowed Claims, and at the conclusion of the holdback period for the $10 million holdback required by the Term Sheet and CSA, the Interest Holders of the Debtors shall receive their pro rata share of the remaining proceeds in accordance with the Plan.

The Purchase Price for the new shares to be issued in the Reorganized Debtors will be allocated between Davis Petroleum Corporation (40%), Davis Offshore LP (59%) and Davis Pipeline (1%).

A Liquidating Trustee shall be appointed at the confirmation hearing. The Liquidating Trustee shall administer the trust assets in accordance with the terms of the Plan and the Liquidating Trust Agreement. A copy of the proposed Liquidating Trust Agreement is attached as <u>Exhibit 8</u>. The Liquidating Trustee shall report to the Advisory Committee. The Advisory Committee will be Barbara Davis, Gregg Davis, Dana Davis, John Davis, Patricia D. Raynes and Nancy Davis. The Liquidating Trustee shall have the authority to resolve and allow all claims against the Debtors in accordance with the Plan and the Bankruptcy Code.

### 4.    New Equity Interests

As of the Effective Date, the issuance of new stock in Davis Petroleum, new partnership interests in Davis Offshore, and new member interests in Davis Pipeline are authorized without further act or action under applicable law, regulation, order or rule. All such new Interests to be issued will be deemed issued as of the Effective Date regardless of the date on which it is actually distributed.

### 5.    Directors and Officers

On the Effective Date, the officers and directors of the Reorganized Debtors are expected to be:

<u>Reorganized Davis Petroleum Corp.</u>

| Officers: | Gregg Davis, President |
| | Ciara Burnham - (Buyer Designee ), Vice President |
| | Mayer Bick (Buyer Designee ), Secretary/Treasurer |

| Directors: | Gregg Davis |

Ciara Burnham (Buyer Designee)
William Hiltz, (Buyer Designee)

Reorganized Davis Petroleum Pipeline LLC

Officers:     Gregg Davis, President
              Ciara Burnham (Buyer Designee), Vice President
              Mayer Bick (Buyer Designee ), Secretary/Treasurer

Directors:    None

Reorganized Davis Offshore LP

General Partner:   Davis Offshore Partners LLC, a wholly owned subsidiary of Davis
                   Petroleum Acquisition Corp.

### 6.      Revesting of Assets

The property of each Debtor's Estate, together with any property belonging to a Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Debtor on the Confirmation Date. Thereafter, each Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Confirmation Date, all property of each Debtor shall be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order. Without limiting the generality of the foregoing, each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay fees that it incurs after the Confirmation Date for professional fees and expenses.

### 7.      Preservation of Certain Rights of Action; Release of other Causes of Action

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or the Estates may hold against any Person or entity. Each Debtor or its successor(s) may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights

All creditors are being paid in full and there are no prepetition transfers that would qualify as preferential transfers.

### 8.      Assignment of Litigation Claims

The Debtors will assign any causes of action or claims whether asserted or unasserted, to the Liquidating Trustee, including but not limited to, claims and causes of action against officers and directors including, but not limited to, the causes of action asserted, or that could be asserted as arising from the same transactions or occurrences, against any Defendant named in the civil action styled and numbered: *Patricia Davis Raynes et al. v. Marvin Davis, et al.,* Civil Action No. 05-06740-ABC-CT, pending in the United States District Court for the Central District of California, as set forth in the Plan to the Liquidating Trustee, and including but not limited to any causes of action arising under Chapter 5 of the Bankruptcy Code.

### 9.      Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages by or from a Debtor to a Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 10.      Effectuating Documents; Further Transactions

The chairman of the Board of Directors, president, chief financial officer, or any other appropriate officer of the Debtors, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of the appropriate Debtor shall be authorized to certify or attest to any of the foregoing actions.

### D.      Provisions Governing Distributions

### 1.      Liquidating Trust

On the Effective Date, a Liquidating Trust shall be established.   The Liquidating Trust shall be funded with that portion of the Purchase Price that is not paid to satisfy Allowed Claims on the Effective Date.  All policies of insurance belonging to the Debtors and covering the Indemnity Claims or any other insurable claim shall also be contributed to the Liquidating Trust. The Liquidating Trust shall liquidate and pay all Allowed Claims and Interests.  The Liquidating Trust shall reserve and retain $10 million of the Purchase Price to secure the Debtors' obligations to the Purchaser under the CSA. To the extent the D & O policies or any other applicable insurance policies are insufficient to pay the Indemnification Claims or other insurable claims, the residual claims will be paid from the funds held in reserve for such claims by the Liquidating Trustee upon allowance.

The Liquidating Trustee shall make distributions from the trust assets to all creditors in accordance with the Plan and the Liquidating Trust Agreement attached hereto as <u>Exhibit 8</u>.