incurred by the debtor in the Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtors during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the bankruptcy court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

As shown in the Liquidation Analysis annexed hereto as <u>Exhibit 4</u> to this Disclosure Statement, the Debtors believe that each member of each Class of Claims and Interests will receive at least as much, if not more, under the Plan as they would receive if the Debtors were liquidated in Chapter 7 Cases. More specifically, a liquidation of the Debtors would significantly impair recoveries to all stakeholders and clearly is not in the best interests of estate constituencies. Accordingly, it is clear that stakeholders will fare much better under the Plan than in a liquidation. The Plan therefore satisfies the best interests test.

**D.     Confirmation Without Acceptance of All Impaired Classes -- "Cramdown"**

The Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they reserve the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. Under section 1129(b) of the Bankruptcy Code, the Court may confirm a plan over the objection of a rejecting class, if, among other things, (a) at least one impaired Class of Claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (a) (i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds

of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interests of such class will receive or retain under the plan any property on account of such junior interest.

As explained above, the only impaired classes are 9,10 and 11 which are classes of interest holders.

## VII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors' believe that the Plan affords the best alternative for maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies. If the Plan is not confirmed, the theoretical alternatives include: (a) continuation of the pending Chapter 11 cases, (b) formulation of an alternative plan or plans of reorganization, (c) a sale of the company's assets under section 363 of the Bankruptcy Code, or (d) liquidation of the Debtors under Chapter 7 or 11 of the Bankruptcy Code. The Debtors do not believe that any of these theoretical going concern alternatives is viable or realistic and that the only practical alternative to prompt confirmation of the Plan is immediate liquidation under Chapter 11 or Chapter 7.

As explained above, the Debtors do not believe that a traditional Chapter 11 process, under which a plan is developed and proposed post-petition, is viable here. The Debtors' business simply will not withstand the uncertainty and doubt engendered by such a process. The Term Sheet and CSA proposed by Evercore does not allow sufficient to time to pursue other alternatives. Moreover, administrative expenses would be far higher in a traditional Chapter 11.

There are no viable sources of financing in the amounts necessary to sustain such a process other than a prepackaged plan. The Debtors have no debtor-in-possession financing facility, and they have exceptionally limited cash resources of their own.

Moreover, Davis Offshore is past due on the Clipper, Lorien, and Bellis Prospects. The operators of these prospects can put Davis Offshore in non-consent status with a 30-day notice letter. If the default notices are not cured within 30 days, then Davis Offshore is deemed to be in non-consent status as to any future operation. Davis Offshore will be deemed to go non-consent

35

as to those future operations resulting in losses of many millions of dollars of reserves to Davis Offshore.

While a more traditional Chapter 11 is not a realistic alternative, the Debtors and their advisors did consider the possibility of a sale of their assets or other transaction under section 363 of the Bankruptcy Code and alternative structures that theoretically would allow an infusion of cash from an outside source. However, these also are not realistic alternatives given the exigencies of Debtors cash situation, and hence, are not value-maximizing propositions at this time.

After much analysis of available alternatives and consideration of various options, the Debtors and their management concluded that the prepackaged Chapter 11 case was the best option .

Absent prompt confirmation, the Debtors believe there is a substantial likelihood that creditors will not be paid in full and that Interest Holders will receive zero. The Debtors believe that in a liquidation under Chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

Attached hereto as Exhibit 4 is a liquidation analysis prepared by FTI Consulting which shows that the holders of equity interest claims in the Debtors will receive more under this prepackaged Chapter 11 case than they would in a Chapter 7 case.

THE DEBTORS THEREFORE BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO INTEREST HOLDERS THAN WOULD ANY OTHER ALTERNATIVE AND THAT IT SHOULD BE CONFIRMED PROMPTLY.

## VIII.   FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   General

#### 1.   Statutory Overview

The purpose of this provision to provide a discussion of the potential material Federal income tax consequences of the plan to Debtors, to the  Reorganized Debtors, and the hypothetical holders of claims or interests in the case that would enable such a hypothetical investor to make an informed judgment about the Plan, as contemplated in 11 U.S.C. § 1125(a)(1). The Federal income tax consequences discussed herein are those arising under the Internal Revenue Code of 1986, as amended (the "Tax Code") and the income tax regulations promulgated thereunder, (the "Regulations") and case law, revenue rulings, revenue procedure and other authority interpreting the relevant sections of the Tax Code and the Regulations.

502183 000030 HOUSTON 442070.2

This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as taxpayers who are not United States domestic corporations or citizens or residents of the United States, S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers, non-profit entities or foundations, small business investment companies, persons that hold Claims or Equity Interests as part of a straddle or conversion transaction and tax-exempt organizations).

No administrative rulings will be sought from the Internal Revenue Service ("IRS") with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be accepted by the IRS. No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY. ALL EQUITY HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, AS WELL AS STATE AND LOCAL TAX CONSEQUENCES AND FEDERAL ESTATE AND GIFT TAXES.

### 2.    Tax Consequences to Davis

The Plan contemplates that all creditors of the Debtors will be paid in full. Therefore, the federal income tax issues associated with the cancellation of debt are not discussed herein.

Debtors are each pass-through entities, that is, the equity owners report all items of income, gain, loss, deduction and credit. The entities file returns of income, but the entities are not liable for federal income tax. Davis Petroleum Corporation is a Subchapter S corporation. Davis Offshore is a limited partnership and Davis Pipeline is a limited liability company which is treated as a partnership for federal income tax purposes. Offshore has one general partner, Davis Offshore Management, LLC, and one limited partner, Davis Offshore Holdings, LLC. Both entities are also pass-through entities. Therefore, all items of income, gain, loss, deduction and credit of each of Davis Offshore's two partners are reported by the members of the two limited liability companies that are its partners.

The transaction between Davis Acquisition and Debtors is an arms-length transaction, between unrelated parties. Davis Acquisition has proposed the allocation of values for Davis Petroleum, Davis Offshore and Davis Pipeline, which allocations were accepted by Debtors. While Debtors do not know the precise valuation methodology of Davis Acquisition, and the individual valuation of each oil and gas properties and other assets of Debtors, based on Debtors' own assessment of the value of the various assets, the allocations seem reasonable and have been accepted. In the event the Internal Revenue Service does not accept the allocations and makes a successful challenge to them, the tax consequences to the Debtors' equity owners could be

37

502183 000030 HOUSTON 442070.2

affected, even though the ultimate ownership of Davis Petroleum , Davis Offshore and Davis Pipeline are identical.  A change in the allocations could affect the amount of recapture realized, as well as affect a difference in the character of income, gains or losses realized if gain or loss is shifted from long-term to short-term or short-term to long-term or from capital to ordinary or ordinary to capital.

Pursuant to the Plan, Davis Petroleum, Davis Offshore, and Davis Pipeline will each sell their assets to Davis Acquisition which will assume the post-effective date liabilities of Davis Petroleum, Davis Offshore and Davis Pipeline for cash, which will in turn be distributed to the equity holders, subject to a portion of the sales price being held back in escrow to secure representations and warranties. Because each of Davis Petroleum, Davis Offshore and Davis Pipeline are pass-through entities and thus not taxed, gain or loss will be recognized by the holders of the equity interests in the same manner as gain or loss would have been recognized had the same transaction taken place outside of bankruptcy.  The equity holders and Davis Acquisition are urged to consult their tax advisors on the tax consequences of the transactions.

## IX.    OTHER MATTERS

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any Exhibits to such documents (at your own expense, unless otherwise specifically required by Fed. R. Bankr. P. 3017(d)), please contact the Counsel for the Debtors.

## X.    RECOMMENDATION AND CONCLUSION

THE DEBTORS BELIEVE THAT THE PLAN'S CONFIRMATION IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND THEIR CREDITORS. FOR THESE REASONS, THE DEBTORS URGE ALL INTEREST HOLDERS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY THE VOTING AGENT ON OR BEFORE MARCH 7, 2006.

502183 000030 HOUSTON 442070.2

Dated: March 7, 2006, at Houston, Texas.

**DAVIS PETROLEUM CORP.**

By:_____
       Gregg Davis, President

**DAVIS OFFSHORE, L.P.**
By: Davis Offshore Management LLC, its general
partner

By:_____
       Gregg Davis, President

**DAVIS PETROLEUM PIPELINE, LLC**

By:_____
       Gregg Davis, President

39

**RHETT G. CAMPBELL** (SBN 03714500)
Phone:  713 653 8660
Rhett.Campbell@tklaw.com
**DIANA W. WOODMAN** (SBN 21942300)
Phone:  713 951 5830
Diana.Woodman@tklaw.com
**MITCHELL E. AYER** (SBN 01465500)
Phone:  713 653 8638
Mitchell.Ayer@tklaw.com
**MATTHEW R. REED** (SBN 24046693)
Phone:  713 653 8695
Matt.Reed@tklaw.com
**THOMPSON & KNIGHT LLP**
333 Clay Street, Suite 3300
Houston, Texas 77002
Phone:  713-654-8111
Fax:  713-654-1871

-and-

**SHELBY A. JORDAN** (SBN 11016700)
sjordan@jhwclaw.com
**HARLIN C. WOMBLE** (SBN 21880300)
hwomble@jhwclaw.com
**NATHANIEL PETER HOLZER** (SBN 00793971)
pholzer@jhwclaw.com
**JORDAN, HYDEN, WOMBLE,**
**CULBRETH & HOLZER, P.C.**
500 N. Shoreline Blvd, Suite 900
Corpus Christi, Texas 78471
Telephone: (361) 884-5678
Telecopier: (361) 888-5555

**Proposed Attorneys for Davis Petroleum Corp.,**
**Davis Offshore L.P., and**
**Davis Petroleum Pipeline LLC**

502183 000030 HOUSTON 442070.2