Exhibit 1

# EXHIBIT 1

**Chronology Of Key Events Through The Collapse Of The Original Evercore Deal**

| 1. | September 2004 | Marvin Davis, the patriarch of the Davis family, died. *See* R53, Ex. 6 (Diamond Tr.) at 17:21-18:14. |
|---|---|---|
| 2. | December 2004- January 2005 | Gregg Davis, as President and CEO of Davis Petroleum, advised the rest of the Davis family (whose Trusts privately held the equity of Davis Petroleum),[1] that Davis Petroleum was in serious need of a capital infusion and certain members of the Davis family expressed the desire for a transaction to provide an opportunity to "monetize" some or all of their equity interests.  R53, Ex. 1 (Armel Tr.) at 38:25-39:16; R53, Ex. 11 at D-94. |
| 3. |  | Gregg Davis informed other members of the Davis family that he was seeking interested parties to invest equity as part of a management-led buyout, and that Willem Mesdag had expressed interest in investing alongside with any new equity group.  *See* R53, Ex. 6 (Diamond Tr.) at 25:2-27:15; R53, Ex. 12 at D-94, D-95, D-113. |
| 4. |  | All Davis family trusts retained counsel to represent their interests. *See* R53, Ex. 12 at D-7, D-110; R53, Ex. 6 (Diamond Tr.) at 125:13-126:5. |
| 5. | April 2005 | The Davis Family Counsel retained O'Melveny & Myers to act as independent counsel for a special committee, to be formed with a single independent director, to be empowered to exclusively lead a search for new capital investors, or any other transaction, to finance or sell Davis Petroleum, to address potential conflicts of interest posed by Gregg Davis' expressed desire to remain with Davis Petroleum in any transaction, to monetize the other Davis family members' interests and to obtain needed capital for Davis Petroleum. R53, Ex. 6 (Diamond Tr.) at 30:14-32:12; R53, Ex. 12 at D-5; R59 (Armel Decl.) at ¶¶ 5-6. |
| 6. | May 2005 | The Independent Director was elected by the Davis family trusts for the express purpose of reviewing, evaluating, soliciting and taking all action which could be taken by the board or similar governing entity with respect to any possible equity transactions or financing transactions involving Davis Petroleum.  *See* R11, Ex. 12 (Written |

---

[1] Davis Petroleum's equity was 100% family-owned by six trusts controlled, respectively, by Marvin Davis' widow, Barbara Davis, with 56% of the equity interest, and the five Davis children (Patricia Davis Raynes, John Davis, Dana Davis, Nancy Davis, and Gregg Davis), each with 8.8% of the interest. *See* R125 (Disclosure Statement) at 10.

| | | |
|---|---|---|
| | | Consent of the Stockholders In Lieu of a Meeting ("Stockholder Written Consent")).[2] |
| 7. | | The Independent Director is provided with a summary of the three proposals from Evercore, Sankaty and Riverstone-Carlyle, which had been solicited by Gregg Davis and Willem Mesdag.  R53, Ex. 14 at Armel-28. . |
| 8. | May 26, 2005 | The Independent Director identified "the Company's current liquidity crisis" and "Current Proposals For An Equity Injection" among the discussion topics on the agenda for a meeting with Davis Family Counsel.  R53, Ex. 12 at D-13. |
| 9. | June 2005 | Counsel for the Independent Director provided Davis Family Counsel with a contact list which identified counsel and advisers to the various parties, showing each Davis family member as represented by one or more counsel; "Davis Petroleum Corp./Special Committee" represented by Dan Armel and O'Melveny, and Gregg Davis as being represented by counsel, including counsel for "Management Recap" and "Willem Mesdag" of "Red Mountain Capital Partners, LLC" as the "Financial Adviser re: Management Recap" for Gregg Davis.  R53, Ex. 12 at D-17; R53, Ex. 6 (Diamond Tr.) at 76:3-77:1. |
| 10. | | The Independent Director retained Jefferies & Company, Inc. ("Jefferies") as an investment banker "to act as (a) exclusive financial advisor to the Special Committee in connection with any |

(continued…)

---

[2]   *See* R53, Ex. 14 at Armel-1 ("Armel Retention Letter"), dated May 1, 2005 at 2-3; R53, Ex. 12 at D-11 (the "Special Committee Charter") at 1; R11, Ex. 15 ("Board Written Consent") at 1.  The only two Interest Holders who did not return a Stockholder Written Consent to elect the Independent Director to the board of DPC were the Patricia Davis Raynes Trust and the Nancy Davis Trust.  Michael Diamond testified that the Nancy Davis Trust had no objection to the Independent Director's retention. R53, Ex. 6 (Diamond Tr.) at 58:14-60:2; R53, Ex. 12 at D-10.  The Special Committee Charter empowered the Independent Director to:

> (i) Review and evaluate, and consider whether it is in the best interests of the Company [DPC] to enter into, potential equity recapitalization transactions, sale transactions, acquisition transactions, business combinations and other strategic transactions presented to or considered by the Company (each an "Equity Transaction"); (ii) directly or indirectly, solicit or receive proposals from persons or entities that propose to enter into any Equity Transaction with the Company, and (iii) if the Committee determines an Equity Transaction is in the best interest of the Company, to take…all action which could be taken by the Board with respect to such transaction or to make a recommendation to the Board or the shareholders of the Company with respect to such transaction.

R11, Ex. 15 (Board Written Consent) at 1 (emphasis added); R53, Ex. 12 at D-11 (Special Committee Charter) at 1; *see also* R53, Ex. 14 at Armel-1 (Armel Retention Letter) at 2-3.  The Independent Director and the Special Committee were represented by O'Melveny & Myers LLP ("O'Melveny"), which also served as counsel to the Davis Operating Entities in connection with, *inter alia*, the Evercore transaction.  *See, e.g.*, R128 (Conf. Tr.) at 2; R53, Ex. 12 at D-17 ("DPC Contact List").

NYI-4159357

| | | |
|---|---|---|
| | | strategic transaction involving [the Davis Entities] or any of the Company's assets through any structure or form of transaction and/or (b) exclusive financial advisor to the Special Committee in connection with the structuring, issuance, sale or placement of equity and/or debt financing [subject to carve outs for existing secured lenders]." R11, Ex. 16 ("<u>Jefferies Retention Letter</u>"), dated June 16, 2005 at 1. The Jefferies Retention Letter offered a financial incentive to Jefferies to locate new proposals by providing an additional fee if Jefferies brokered a deal with an investor other than Evercore. *Id.* at 3. |
| 11. | | The Independent Director advised the Davis Family Counsel that Davis Petroleum faced significant liquidity issues and had received a "going concern" qualification as part of its audited financial statements in June 2005. R59 (Armel Decl.) Ex. 3. |
| 12. | | O'Melveny, at the Independent Director's request, had provided Davis Family Counsel with Davis Petroleum's combined audited financial statements along with the auditors' report from KPMG that contained a going concern qualification in the absence of a major equity infusion. R59 (Armel Decl.) ¶ 11, Ex. 3. |
| 13. | June 23, 2005 | The Independent Director sent a letter to all Davis Family Counsel advising them that Jefferies was on board and would provide its views shortly on the pending Evercore proposal, and that "<u>the company's continued viability will be contingent upon an equity infusion of the type proposed by Evercore or a sale of the company to an entity or group that can provide additional equity and the time in which we have to complete that transaction is not extensive</u>." R59 (Armel Decl.) Ex. 5 at 2. |
| 14. | July 2005 | By no later than July 2005, the Independent Director attested that he had received and reviewed a copy of the January 31, 2005 Red Mountain Advisory agreement between Gregg Davis and Willem Mesdag/Red Mountain ("<u>Red Mountain Agreement</u>").[3] R59 (Armel |

---

[3] This is the agreement referred to by the Nancy Davis Trust as the "Secret Agreement" which she claims she was unaware existed until it was appended to a proof of claim filed by Red Mountain in the Davis Petroleum bankruptcy proceedings in April 2005. While Ms. Davis may have been unaware of the document, the uncontroverted record confirms that the Red Mountain Agreement was known to the Independent Director [R59 (Armel Decl.) at ¶ 17, Ex. 6], provided to counsel for Patricia Davis Raynes in the summer of 2005 [R53, Ex. 6 (Diamond Tr.) at 307:24-309:15; R87 ("<u>Bennett Reply Declaration</u>"), Ex. 18]; listed on the schedule of "material agreements" which was provided to all Davis Family Counsel in connection with the expected closing of the Original Evercore Deal and appended as an exhibit to the Disclosure Statement [R125, Ex. 9; Bankr. Dkt No. 17, Ex. 9], and that the fees claimed by Red Mountain thereunder were identified on the "flow of funds" schedule negotiated by the Independent Director and provided to all Davis Family Counsel [R53, Ex. 12 at D-77], with an e-mail in January 2006 from the Independent Director to Davis Family Counsel highlighting the fact that these fees

- 3 -

| | | Decl.) ¶ 17, Ex. 6. |
|---|---|---|
| 15. | September 2005 | The Independent Director considered competing proposals from Evercore and Constellation Energy ("Constellation"). R53, Ex. 6 (Diamond Tr.) at 158:4-159:7. |
| 16. | September 13, 2005 | Patricia Davis Raynes ("Raynes"), Nancy Davis' sister, filed a lawsuit naming various members of her family, including Nancy Davis, as defendants. *See Raynes et al., v. Davis, et al.*, Civil Action No. 05-06740-CV (C.D. Cal.) ("*Raynes* litigation"). R53, Ex. 12 at D-26 (Raynes Complaint). Among other claims, Raynes asserted claims for breach of fiduciary duty against the directors of DPC as well as certain of its officers, including Gregg Davis, and claims against her mother, Barbara Davis. *See* R128 (Conf. Tr.) at 21-22. Each of the officers and directors of DPC (as well as certain other Davis-related entities) asserted indemnity rights against DPC for reimbursement of costs and expenses associated with defending the *Raynes* litigation and, ultimately, for any liability that Raynes might establish. *Id.* |
| 17. | October 2005 | After apprising the Davis family of the positive news at the Clipper prospect, with the support of the Davis Family Counsel, the Independent Director entered into exclusivity with Evercore for a deal that offered a purchase price "based on a Total Enterprise Value of [the Davis Operating Entities] of $147.9 million," which was to be "adjusted as necessary at closing for changes in cash, working capital and debt balances…" R53, Ex. 12 at D-35 ("October Proposal") at 1; R11, Ex. 9("exclusivity agreement"). The October Proposal clearly identified Red Mountain and Sankaty as potential co-investors in the transaction: "We [Evercore] intend to partner in this transaction with Sankaty Advisors, LLC and Red Mountain Capital Partners, although our offer is not contingent on their participation." R53, Ex. 12 at D-35 at 2 (emphasis added). The October Proposal and attached Summary of Proposed Terms also provided that "[t]o the extent certain Davis Family members would like to sell less than 100% of their holdings, we are willing to accommodate them in this transaction," expressly allowing Davis family members to choose to invest alongside Evercore as part of the Original Evercore Deal. *Id.* |

(continued…)

were an open item in the negotiation with Evercore [R53, Ex. 12 at D-53]. Moreover, the alleged conflicts which the Nancy Davis Trust claims to have become aware of only upon receipt of the so-called "Secret Agreement" were in fact the basis on which the Davis Family Counsel had put in place independent counsel and the Independent Director [*see supra* Chronology ¶ 5], and Gregg Davis' and Red Mountain's intention to participate in any deal with Evercore was always disclosed in the documents provided by the Independent Director to Davis Family Counsel [R53, Ex. 12 at D-30], again rendering any contention that this information was hidden directly contradictory to the documents produced by the Nancy Davis Trust's own former counsel.

- 4 -

| | | at 1. |
|---|---|---|
| 18. | October 2005-January 2006 | The parties negotiated formal documents to memorialize what has been referred to as the "Original Evercore Deal," with the negotiations conducted directly between Evercore and its counsel on behalf of the buyer group (Evercore, Red Mountain, and Sankaty), and the Independent Director and O'Melveny taking the lead on behalf of the Davis family trusts, each represented by separate counsel. *See* R53, Ex. 12 at D-53, D-71; R59 (Armel Decl.) ¶¶ 31-34. |
| 19. | | The Independent Director negotiated forbearance agreements with Davis Petroleum's secured lenders, and had been deferring payments and using "other people's money," or "OPM," to stay afloat and avoid running out of cash, all with the understanding that creditors would be paid out of proceeds at the closing of the Original Evercore Deal. R53, Ex. 1 (Armel Tr.) at 183:23-185:8. As set forth on the agenda for a meeting with Davis Family Counsel on January 9, 2006, the Independent Director informed the Davis Family Counsel that they were proceeding with "open defaults" with their lenders and were expected to run out of cash by approximately January 20, 2006. R53, Ex. 12 at D-39, D-47; R53, Ex. 16. |
| 20. | January 2006 | Given the pending Raynes litigation, the Original Evercore Deal was explicitly conditioned on satisfactory releases to ensure that Davis Petroleum and its acquirers would be free and clear of any such claims after the closing of the Original Evercore Deal. *See* R11, Ex. 8 ("Draft CSA") at 15; R128 (Conf. Tr.) at 22. Davis Family Counsel were actively involved in negotiations with the Independent Director and Evercore to reach resolution on this issue. *Id.* at 20, 22, 24-25. |
| 21. | January 21, 2006 | By e-mail, O'Melveny warned Ms. Raynes' counsel that "[i]f this transaction does not go through, DPC will have very serious financial difficulties which could well diminish its value to the sellers or to any future buyer by an amount well in excess of the claims the buyer is asking to be released." R53, Ex. 12 at D-59. |
| 22. | January 24, 2006 | Counsel for Barbara Davis wrote Ms. Raynes' counsel, copying all Davis Family Counsel, to state that "we are startled and disturbed" by Raynes' counsel's holding up the closing of the Original Evercore Deal based on release issues since "every draft of the operative sale documents has required both a release of claims and an indemnity against your client's suit. . . .The banks have now issued default notices, and your 'deal-killer' may have placed the Company in an untenable position." R53, Ex. 12 at D-62, D-65. |

- 5 -

| 23. | February 6, 2006 | Evercore and the Independent Director stood ready and willing to close the Original Evercore Deal, subject to receipt of executed final documents from all Interest Holders.  *See* R128 (Conf. Tr.) at 20-21. The transaction failed to close and the Independent Director resigned when Raynes did not execute the final documents out of concerns about executing the requisite releases on her pending litigation.  *See, e.g., id.* at 21-22.  The Independent Director resigned. |
| --- | --- | --- |
| 24. | February 7, 2006 | Davis Petroleum's secured lenders, Bank of America and Sankaty, sent notices of acceleration.  R53, Ex. 16; R128 (Conf. Tr.) at 26:4-7. |
| 25. | February 10, 2006 | Davis Petroleum, met with Bank of America's counsel and financial advisor, Alvarez & Marsal, to address Bank of America's issues with respect to cash and collateral.  *See* R128 (Conf. Tr.) at 26. |
| 26. | February 13, 2006 | Davis Petroleum's board, with the approval of Davis Family Counsel, retained experienced bankruptcy counsel, Rhett Campbell of Thompson & Knight.  R53, Ex. 12 at D-80; R128 (Conf. Tr.) at 26:15-23.  Rhett Campbell prepared a preliminary analysis of the chapter 11 process, provided to Davis Family Counsel, which reflected that even if the company had an enterprise value greater than $147 million (referring to the October Evercore Proposal), the costs of the chapter 11 process were significant and the "burn rate" associated with being in a chapter 11 case was estimated to be $760,000 per month. |
| 27. | February 14, 2006 | An independent financial advisor, Bert Conly of FTI, was retained by Davis Petroleum and immediately began updating Davis Petroleum's financial statements and assessing its cash position. R11, Ex. 24 (Conly Proffer) at 1; R128 (Conf. Tr.) at 26:15-23. |

- 6 -